# EXHIBIT A

BEFORE THE ARBITRATOR

| | |
|---|---|
| In the Matter of the Arbitration of a Dispute Between<br><br>TEAMSTERS LOCAL UNION 727<br><br>and<br><br>CHICAGO TRIBUNE COMPANY, LLC | FMCS Case No. 160412-0135-7<br>(Gap Pay Grievance) |

<u>Appearances</u>:

    Illinois Advocates LLC, by <u>Mr</u>. <u>Matt</u> <u>Carpenter</u> on behalf of the Union.
    Honigman Miller Schwartz and Cohn, LLP, by <u>Mr</u>. <u>Russell</u> <u>S</u>. <u>Linden</u> on behalf of the Company.

## <u>ARBITRATION AWARD</u>

The above-entitled parties, herein "Union" and "Company," are signatories to a collective bargaining agreement, herein "agreement," providing for final and binding arbitration. Pursuant thereto, a hearing was held in Chicago, Illinois, on February 23, 2018, which was transcribed. The parties there agreed I would retain remedial jurisdiction if the grievance is sustained, and they subsequently filed briefs which were received by May 26, 2018.

Based upon the entire record and the arguments of the parties, I issue the following Award.

## <u>ISSUE</u>

The parties have agreed to the following issue:

    Whether the drivers covered under the parties' collective bargaining agreement are entitled to what is known as gap pay for additional work they do beyond their regularly scheduled shift and, if so, what is the appropriate remedy?

BACKGROUND

The Company publishes the Chicago Tribune newspaper and employs about 120 truck drivers to deliver its newspapers and other publications. Relay drivers operate tractor trailers and deliver bulk loads of newspapers to various distribution centers. Route drivers operate trucks to deliver newspapers to gas stations, stores, stands, vending machines, and newspaper boxes throughout Chicago and they collect money from vendors. Most route driver shifts start between 1:00 a.m. – 3:00 a.m. and most relay driver shifts start before 1:00 a.m. There are separate seniority lists for each set of drivers and routes are awarded based upon seniority. Shifts normally last 7.5 or 8 hours and drivers are fully paid for their shifts regardless of when they finish. The Company maintains a "book" to assign routes which keeps track of all daily shifts, whose position is being filled, start and end times, and route details.

Gap pay (also called bridge pay) is paid at 1.5 times the rate of a driver's base pay rate and relates to the time off between shifts and it is provided for in Section 12 of the agreement which states that drivers are entitled to 10 hours' rest between shifts and that they are to be paid up to 10 hours if that gap is broken.

Union representative Melissa Senatore in about March 2016 asked Transportation Operations Manager Mike Stasinos about whether gap pay was properly being paid, and she on March 17, 2016, filed a class action grievance "On behalf of all Teamsters Local 727 Tribune members" which stated: "Gap pay provision was a past practice that must be honored with respect to DOT laws," (Joint Exhibit 3). The grievance did not identify any drivers who were deprived of gap pay.

The parties in 2014 negotiated over the terms of a successor agreement and they in January 2015, signed a successor agreement which stated in pertinent part: "1. All of the terms

2

and provisions of the expired agreement shall continue in full force and effect up to and including June 14, 2016," (Joint Exhibit 1). That successor agreement carried over the contract language regarding gap pay.

The parties on March 23, 2017, executed a Memorandum of Agreement, (herein "Memorandum"), with certain tentative agreements which were to be implemented upon the resolution of a pension issue, (Joint Exhibit 2). The Memorandum thus stated:

> The wage increases, lump sum bonus and all of the other changes to the existing Collective Bargaining Agreement contained in the numbered paragraphs will only become effective upon the pension merger.

The following witnesses testified.

Route driver Anthony D. Wendel, the Chief Union Steward, has been employed for over 30 years and worked as a relay driver up until about 15 years ago. He testified that when he was employed as a relay driver he broke the ten-hour rest requirement "quite often," and that if he worked back-to-back shifts he would "get paid for the two shifts plus ten hours' gap pay." He also stated that if he went home and then was called back to work during the 10-hour gap period, he would be paid time and a half for the number of hours he worked and the remaining number of hours he did not work during that 10-hour gap period. He added that the gap pay language in Section 12 has remained the same for over 30 years and that the Company in March 2016 changed its position on paying gap pay.

He further stated that he has not done a double shift where he received gap pay in more than ten years; that an unnamed driver told him in March 2016 he had not been paid gap pay; and that Mr. Stasinos in March 2016 told him the Company no longer would call in drivers and pay them gap pay because of U.S. Department of Transportation, ("DOT"), guideline requiring ten

3

hours' rest between shifts. He also said that the Company during the grievance procedure never claimed the grievance was not valid and that he was told by Union Secretary-Treasurer John Coli, Junior that the parties in negotiations for the 2017 Memorandum "agreed that everything would stay status quo" in the expired contract.

Al Klepadlo previously was employed by the Company for about 27 years and served as its Transportation Operations Manager for about 12 years before leaving the Company in 2013. In that role (and in the prior eight or so years before then) he helped manage everything relating to scheduling drivers. He testified that in order to receive gap pay it did not matter how long a driver worked on an additional second shift, and that a driver then would receive gap pay "100 percent of the time" when the ten-hour gap would be violated regardless of how many hours he worked on the second shift, and that a driver "Not necessarily" would have to leave the premises to receive it. He also said that defined shifts would be split only during emergencies; that the ten-hour break rule would be broken whenever drivers worked back-to-back shifts; and that he personally reviewed all requests for gap pay when he formerly was the Transportation Operations Manager.

He added that he was not being paid to testify and that he took a personal day off from his current job to testify; that he formerly earned about $100,000 when he worked for the Company and that he now earns about $50,000; that he was let go by the Company in 2013 as part of a larger reduction in force; and that his wife and attorney spoke to Vice President of Distribution Bob Thomas to complain over how he had been treated by the Company. He further stated that he was "upset for a brief period" over his termination and that, "I was loyal to them and they were loyal to me. They provided for me, my home; my family's education and a nice

401K." He also said that he since 2013 has been unaware of the Company's operations and could care less about them, and that gap pay was paid about 3-4 times a month during his tenure with the Company.

Business Agent Senatore testified "there has been a long history" of paying gap pay whenever drivers are called in to work within the ten-hour gap and when drivers are asked to work back-to-back full or partial subsequent shifts. She stated that Mr. Stasinos told her in March 2016 that the Company no longer would call in drivers and pay gap pay because of DOT guidelines; that neither party in the subsequent 2017 contract negotiations made a proposal regarding gap pay; and that the Company then stated it no longer would pay it. She also said that Mr. Stasinos asked her for examples of past practice where gap pay was not properly paid and that she did not provide him with that information.

Transportation Operations Manager Stasinos is responsible for scheduling drivers and has worked for the Company since 2002 and has held his current position since 2013. He testified that he told the Union in March 2016 that the Company no longer would call people in within the ten-hour gap because of concerns over complying with DOT guidelines. He also stated that he was unaware of any practice whereby the Company paid gap pay to drivers performing additional work that wasn't their bidded work and that he did not know why Mr. Klepadlo testified to the contrary. He also said that he called former team loader Ray Kurpienski who oversaw payroll and who told him that gap pay was paid only when a driver went home and was called in within the ten-hour bridge. He further states that drivers never work a double shift and that drivers can be ordered to work through their full shifts.

## POSITIONS OF THE PARTIES

The Union states that its class action grievance is valid because it "affects the entire bargaining unit," thereby not requiring the names of the aggrieved drivers and because the Company never raised this issue before the hearing. The Union also states that the Company violated the plain meaning of Section 12 of the agreement by not paying gap pay to drivers who work all or part of a subsequent shift; that bargaining history supports its grievance; that "Payments of gap pay is a clear, long-standing practice"; and that the Company has failed to produce relevant documents in support of its contrary position. The Union adds that the Arbitrator has the authority to grant its requested relief which consists of compensating all affected drivers for unpaid gap pay from March 7, 2016 to the present.

The Company states that the Union has not met its burden of proving the Company violated the agreement because the agreement "does not require paying of ten hours of gap pay for drivers performing another driver's work during their shifts." It further states that the Union "has failed to establish a binding past practice or that any such past practice was violated," and that the Union has not identified "any employee who was ever paid in a manner consistent with the claimed past practice . . ." The Company also asserts that no relief can be granted after the prior agreement expired, and that the Union has failed to establish any violation of the expired agreement.

## DISCUSSION

Section 12 of the agreement states:

SECTION 12. Any man on being recalled after leaving the premises at the conclusion of a day's or night's work shall be paid for the time worked after he is thus recalled at the overtime rate of time and one-half, and shall be paid a bonus of Two Dollars ($2.00), whether employed or not. There shall be at least a ten hour interval between work shifts.

All drivers are required to have a 10 hour bridge between the time they finish **a** shift and start their next one. Whenever the bridge is broken the driver will receive overtime at time and one-half of his hourly rate. The overtime will be the amount of time the 10 hour bridge was broken by, up to a maximum of 10 hours, (Emphasis added).

SECTION 13. All garages of the Employer shall be provided with time clocks. Overtime shall be paid on the basis of overtime worked as reflected by such time records. [1]

The key word here is "a" because it refers to a singular shift and not multiple shifts. As a result, such drivers are entitled to gap pay when they finish **one** shift.

There is a factual dispute over how this language has been applied in the past.

Mr. Wendel testified that when he was a relay driver about 15 years ago he received gap pay for working back-to-back shifts during the 10-hour gap, and that he as a route driver last received gap pay for working back-to-back shifts more than ten years ago. Mr. Klepadlo testified that gap pay was paid "100 percent of the time" when drivers worked back-to-back shifts during the gap period; that shifts were split only during emergencies; and that gap pay was paid about 3-4 times a month during his tenure with the Company. Mr. Senatore testified "there has been a long history" of paying gap pay when drivers worked back-to-back full or partial shifts during the gap period.

Mr. Stasinos denied that any such past practice existed and stated that he spoke to former supervisor Kurpienski who told him gap pay was paid only when drivers went home and were called in within the gap period.

The Union objected to Mr. Stasinos' testimony regarding Mr. Kurpienski on the ground that it was hearsay, and I reserved ruling at the hearing on whether it would be considered. I

---

[1]     Overtime and overtime rates are spelled out in Section 11.

have given it little weight because Mr. Kurpienski was not called as a witness and subjected to cross-examination and because his hearsay statement was directly contradicted by the Union's witnesses.

The Company claims that "Mr. Klepadlo's testimony was not reliable and failed to substantiate existence of the Union's so-called practice," and that his "testimony is entitled to no weight considering his obvious bias" as shown "by his unhappiness concerning his termination from the Company" which resulted in him now earning about $50,000 as opposed to the $100,000 or so he formerly earned with the Company. The Company also states that he left his employment with the Company in 2013 and did not know about the Company's recent operations, and that he had no knowledge of the DOT guidelines.

His lack of knowledge about the guidelines has nothing to do with his credibility. Furthermore, it is not at all surprising that he may be unhappy regarding the circumstances surrounding his termination since he worked for the Company for about 27 years and since he now earns about $50,000 less than when he was with the Company. That unhappiness, however, does not necessarily mean that he chose to lie during his testimony. To the contrary, he showed his gratitude towards the Company when he said: "I was loyal to them and they were loyal to me. They provided for me, my home, my family's education and a nice 401K." Those are not the kind of words that one expects from someone who is willing to perjure himself.

I therefore find that Mr. Klepadlo was a credible witness and I credit all of his testimony.

The Company properly points out that he (and Mr. Wendel and Ms. Senatore) did not specifically identify and specify a driver who was paid consistent to the past practice they described. But, the same is true for Mr. Stasinos who never identified any specific driver who

did not receive gap pay for working back-to-back shifts during the ten-hour gap period and no such documentary evidence ever was produced. (The e-mails exchanged between Ms. Senatore and Mr. Stasinos did not rise to that level.)

In addition, it is significant that the Company has not produced **any** payroll records showing that drivers have worked back-to-back shifts within the 10-hour gap period without being paid gap pay. I therefore draw the adverse inference that the Company's failure to produce such important documentary evidence shows they do not exist.

Based upon Mr. Klepadlo's and Mr. Wendel's testimony, I find that there has been a past practice of paying gap pay when drivers worked all or part of a subsequent shift during the gap period, and that said past practice was unequivocal; clearly enumerated and acted upon; and readily ascertainable over a reasonable period of time as a fixed and established practice accepted by both parties. See Elkouri and Elkouri, How Arbitration Works, (BNA 8th ed., 2016) at 12-4.

Furthermore, no weight can be given to the Company's statement in the 2017 negotiations that it no longer would pay gap pay.

For as Arbitrator Richard Mittenthal wrote regarding such statements:

. . .

Consider next a well-established practice which serves to clarify some ambiguity in the agreement. Because the practice is essential to an understanding of the ambiguous provision, it becomes in effect a part of that provision. As such, it will be binding for the life of the agreement. And the mere repudiation of the practice by one side during the negotiation of a new agreement, unless accompanied by a revision of the ambiguous language, would not be significant. For the repudiation alone would not change the meaning of the ambiguous provision and hence would not detract from the effectiveness of the practice.

It is a well-settled principle that where past practice has established a meaning for language that is subsequently used in an agreement, the language will be presumed to have the meaning given it by practice. Thus, this kind of practice can only be terminated by mutual agreement, that is, by the parties rewiring the ambiguous provision to supersede the practice, by eliminating the provision entirely, etc.

. . .

*Past Practice And The Administration of Collective Bargaining Agreements*, Arbitration and Public Policy, Proceedings of the 14th Annual Meeting, National Academy of Arbitrators, (BNA Books, 1961), 30, 56.

The Company claims that it acted properly because it has the right under Section 3 of the agreement "to designate the work each employee covered by this Agreement shall perform." That, though, is a separate question than what drivers shall be paid when the Company tells them what work must be performed when the ten-hour gap is broken, a matter elsewhere addressed in Section 12 which governs.

The Company also claims that granting the grievance "would require the Arbitrator to rewrite the CBA." To the contrary, granting the grievance simply means that remedial relief is necessary to rectify the Company's contract violation even though the agreement, like most collective bargaining agreements, does not specifically address what remedies can be ordered when the agreement is violated.

The Company also asserts that "The absurdity of the Union's claim is illustrated by Senatore's testimony that Section 12 requires that drivers be paid ten hours of gap pay for performing as little as 15 minutes of an absent driver's not driving . . ." their shifts. The Company, however, can avoid that "absurdity" by simply assigning that work to someone else, as Section 12 on its face categorically states that gap pay must be paid for time worked in **all** circumstances during the ten-hour gap period.

10

I therefore conclude that the Company violated Section 12 of the agreement when it failed to pay gap pay to drivers for additional work they do beyond their regularly scheduled shift.

Turning now to the issue of remedy, the Company immediately must make whole all affected current and past drivers who were deprived of gap pay from March 7, 2016, to the present when they worked part and or all of a back-to-back subsequent shift regardless of whether they had left and returned to the premises.

There thus is no merit to the Company's claim that no such back pay can be granted after the supposedly prior agreement expired. Mr. Wendel testified that Union Secretary-Treasurer Coli told him the parties in the negotiations leading to the 2017 Memorandum then "agreed that everything would stay status quo" in the expired contract. While that statement is hearsay, it is uncontradicted hearsay since no Company witnesses contradicted it.

More importantly, the 2017 Memorandum states:

The wage **increases**, lump sum bonus and all of the other charges **to the existing Collective Bargaining Agreement** contained in the numbered paragraphs will only become effective upon the pension merger, (Emphasis added).

This reference to "the existing Collective Bargaining Agreement" can only refer to the 2016 contract, thereby showing that the parties have agreed to extend it.

Furthermore, remedies can be ordered after a contract has been terminated. See Prate Installations, Inc. v. Chi. Reg'l Council of Carpenters, 607 F.3d 467, 471, (7th Cir. 2010); Enterprise Wheel, 363 U.S. at 597, 80 S.Ct. 1358); Synergy Gas Co., 1330-1154-85, 91 BNA LA 77 (Simons) 1987.

The Union therefore had the right in March 2016 to file its class action grievance over the Company's continuing violation of Section 12 and to obtain gap pay on behalf of all affected drivers from that time to the present.

Based upon all of the above, I conclude that the Company violated Section 12 and I therefore issue the following

<u>AWARD</u>

1.      The drivers under the parties' collective bargaining agreement are entitled to what is known as gap pay for additional work they do beyond their regularly scheduled shift.

2.      The Company shall make whole and pay gap pay to all current and past drivers who were affected in the past by the Company's failure to award them gap pay when they worked part or all of a back-to-back shift during the ten-hour gap period, and the Company in the future shall pay gap pay to all drivers who work such shifts.

3.      In order to resolve any issues relating to the application or interpretation of the remedy, I shall retain my remedial jurisdiction for at least sixty days and I shall automatically extend it if necessary.

Dated: July 25, 2018

                                        Amedeo Greco  /s/
                                        Amedeo Greco, Arbitrator

12

# EXHIBIT B

4825

# TEAMSTERS LOCAL UNION No. 727 GRIEVANCE REPORT
1300 W Higgins Rd, Suite 111, Park Ridge, Illinois, Telephone (847) 696-7500

Today's Date 3/17/16

Member's Name _On behalf of all Teamsters Local 727 Tribune Members_

Phone No. 847.696.7500

Address 1300 W Higgins          City Park Ridge

State IL          Zip Code 60068          Email —

Company Name Tribune          Location —

Date of Grievance: 3/11/17          Nature of Grievance Violation of

Sec. 12, Sec. 11 and any other applicable provision of the CBA, as well as a violation

Years of Service _____ Prior Warnings _____ of past practice. Prior Suspensions _____

NA
_____          Melissa Sinatore
Member's Signature          Union Representative

## MEETING BETWEEN UNION AND COMPANY

Date _____
          Union Representative

Summary of Company's Position _____
          Company Representative

_____

_____

_____

Summary of Member's Position Gap pay provision was a past practice that must be honored with respect to DOT laws.

If settled, terms _____

_____

_____

_____          _____          _____
Union Representative          Company Representative          Member

Disposition:  Settled ☐          Withdrawn ☐          Withdrawn by Member ☐          Arbitration ☐

Member Advised of Disposition   Yes ☐      No ☐          Type of Grievance _____

Manner of Communication _____          Date _____

# EXHIBIT C



# TEAMSTERS LOCAL 727

*Affiliated with the International Brotherhood of Teamsters*

1300 W. Higgins Road, Suite 111 • Park Ridge, Illinois 60068 • Phone: 847-696-7500 • Fax: 847-720-4984 • www.TeamstersLocal727.org

JOHN T. COLI
*Secretary-Treasurer*

JOHN COLI, JR.
*President*

**VIA ELECTRONIC MAIL AND FIRST CLASS MAIL**

Mr. Bob Thomas
Sr. Vice President of Distribution and Transportation
Tribune Publishing Company
777 W. Chicago Ave.
Chicago, IL 60654

Re:     **IBT Local 727 and Chicago Tribune Company, LLC**
         **Memorandum of Understanding**

Dear Mr. Thomas:

The Chicago Tribune Company, LLC and Teamsters Local Union No. 727 ("the parties") are signatories to a collective bargaining agreement which expired on June 15, 2014 ("expired agreement"). The parties met on November 12, December 5, and December 12, 2014 and negotiated a successor agreement to the expired agreement in good faith and agree that the following terms shall represent the successor agreement between the parties:

1.     All of the terms and provisions of the expired agreement shall continue in full force and effect up to and including June 14, 2016;

2.     Each bargaining unit member active on the date of signing this memorandum of understanding shall receive a one thousand dollar ($1,000.00) signing bonus less applicable deductions for taxes in a separate check prior to December 25, 2014;

3.     The grievance settlement agreement resolving Grievance No. 3652, a copy of which is attached to this memorandum of understanding, shall be incorporated as a side letter to the successor agreement.

Teamsters Local Union No. 727

Chicago Tribune Company, LLC

1/9/2015
Dated

1/13/15
Dated

---

*Auto Livery Chauffeurs • Embalmers • Funeral Directors • Apprentices • Ambulance Drivers & Helpers
Taxicab Drivers • Miscellaneous Garage Employees • Car Washers • Greasers • Polishers & Wash Rack Attendants
Motion Picture • Theatrical • Exposition • Convention & Trade Show Employees • Pharmacists • Bus Drivers
Parking Lot Attendants & Hikers • Hotel Industry & Racetrack Industry Employees • Newspaper Magazine • Periodical Salesmen
Drivers • Division Men • District Managers • Checkers • Vendors & Handlers • Electronic Media Workers*

Effective December 15, 2012 thru June 14, 2014

P R E A M B L E

THIS AGREEMENT, made and entered into this _____ day of January, 2013, between Chicago Tribune Company, LLC hereinafter referred to as the Employer, and Teamsters Local 727, hereinafter designated as the Union.

WITNESSETH: That beginning December 15, 2012 and continuing as hereinafter provided, the parties hereto mutually agree that they will respect and observe the following conditions and agreements in the work of the delivery department of the Employer.

All provisions of this Agreement shall apply equally to all employees, male and female. Masculine pronouns or reference in this Agreement shall be deemed to include feminine pronouns or references.

SECTION 1. All present employees covered by this Agreement who are members of the Union shall remain members in good standing as a condition of their employment. All present employees who are not members of the Union shall, 30 days following the effective date of this Agreement, become and remain members in good standing of the Union as a condition of their employment. All employees who are hired hereafter and who are covered by this Agreement shall, 30 days following the beginning of their employment become and remain members in good standing as a condition of their employment.

The Employer shall not continue in its employment and shall discharge any employee covered by this Agreement who is not a member in good standing of the Union as required above within five days after receiving notice from the authorized representative of the Union that such employee is not in good standing within the meaning of Section 8(a), (3), of the Labor Management Relations Act of 1947, as amended.

Upon receipt of a written authorization from an employee covered by this Agreement who is a member of the Union, on the form attached hereto as Side Letter #3, and for so long as the authorization remains in effect, the Employer agrees to deduct from the first paycheck of each month an amount equal to the monthly dues as certified by the Union. The Employer will transmit to the Union the amounts collected each month on behalf of each authorizing employee. The Union agrees to indemnify, defend and hold the Employer harmless against, and to pay all expenses in defense of, any and all claims, demands, suits or other forms of liability that shall arise out of or by reasons of actions taken or not taken by the Employer concerning the provisions of this Section.

SECTION 2. The Employer shall allow a steward at each garage where members of this organization are employed. His duty shall be to see that employees live up to the Agreement and handle such other union business as may be required, and he shall not be discriminated against for his acts as steward.

SECTION 3. The Union recognizes and concedes that all time, either day or night, coming within the hours fixed by this Agreement belongs to the Employer, that the Employer is the only person in authority to direct its employees, and that the Employer's orders must be promptly obeyed by every employee, but always in conformity with the express terms of this Agreement.

It is further understood and agreed that all the traditional functions of management of the enterprise which are not specifically limited by the express language of this Agreement are retained by the Employer, including, but not limited to, the following: the right to hire, discipline or discharge for just cause, to designate the work each employee covered by this Agreement shall perform, which the Employer judges to be in its best interests, pertaining to the promotion, sale, delivery or collection of publications owned or controlled by the Employer or such other delivery work as may be required; to designate the number of men to be employed in any capacity; to make and enforce reasonable shop rules, and to be the sole judge of a man's

1

competency as a workman as well as his general fitness to perform the work required, subject to any employee's right to bring a grievance under the provisions of this Agreement.

Nothing in this Agreement shall be construed as preventing the Employer from having their delivery service managed by a contractor or through a salaried employee nor shall anything in this Agreement be construed as preventing a contractor from driving his own vehicle. In case a contractor operates or drives a vehicle, then that contractor shall be considered a driver and shall come under the terms of this Agreement.

SECTION 4. The Union offers to furnish during the life of this Agreement as many men as are called for by the Employer to perform such work as may be assigned to them by the Employer. The Employer shall notify the Union within five (5) days after its employment of new men covered by this Agreement.

When employees are called for by the Employer, reasonable notice and request shall be given to the Union President, Vice President, Secretary-Treasurer, or other officially named Officer of the Union at a place to be designated in writing by the Union.

SECTION 5. In the event of a permanent delivery job opening as a result of death, retirement, resignation, promotions, adding of steady situations, or discharge, all driver employees shall be permitted to bid for the job openings and bidder with the greatest seniority, shall be considered for the job. Such job openings as well as the second and the third job openings created by a successful bidder(s) moving up shall be posted on the drivers' bulletin board as soon as practicable but no more than thirty (30) days after the job opening occurs. Job opneins shall remain posted for thirty (30) days during which drivers desiring to be considered may apply in writing for such jobs.

To apply in writing a successful bidder must sign his name in person on the job bid, and that letters and telephone calls will not be accepted as a means of bidding on a job. A successful bidder shall not be eligible to bid on another job opening for a one-year period.

Memoranda of job bid openings and successful bids shall be mailed to the President of the Union at the beginning and end of the five (5) week posting period. Job bid openings, once posted shall not be changed or altered as to route or schedule.

Prior to an open route being posted for bid, the front end driver of the route sharing the same day off driver as the open route may switch his days off with the approval of the day off driver.

The Employer shall post known 6th day work opportunities by the Saturday moring preceding each work week.

SECTION 6. In the event a steady employee is permanently transferred from one job to another he shall be given reasonable notice, and, at his request, is entitled to be given sound reason for such permanent transfer in the presence of a Union representative.

SECTION 7. In case routes or relays are diminished, preference shall be given to employees in accordance with their seniority of employment. For bumping purposes, Route/relay/Division distinctions are hereby abolished for applying seniority. For purposes of calling for 6th days, the Employer will continue to keep two separate seniority lists: 1) Relays; 2) Routes. (See Letter Agreement 4 for diminished work).

SECTION 8. The hours of labor shall be continuous except for a reasonable interval to be allowed each day or night for lunch of not less than fifteen (15) minutes and not more than thirty (30) minutes, at the discretion of the Employer, such lunch period to start not earlier than two and one-half (2 1/2) hours nor later than five (5) hours after the beginning of the shift, and such lunch time shall not be a part of the regular hours of labor herein named and shall not be paid for by the Employer.

Any driver who, because of circumstances beyond his control, is required to work through all or a portion of his lunch period shall be paid at the overtime rate for whatever portion of his lunch period was worked.

2

SECTION 9. Day work shall be between the hours of 7 A.M. and 7 P.M. Night work shall be between the hours of 7 P.M. and 7 A.M. provided that any scheduled shift, the straight time hours of which do not fall wholly within the hours of designated day work or night shall be considered a split shift, and the night hours and wages shall be applied to such shift. If a driver starts his shift after 10:30 A.M., the wage scale and hours for night work shall apply to such shift.

SECTION 10. Starting time is to be the time for reporting for work at the time and place designated by the Employer. Time of finish to mean the finish at the place designated by the Employer. The practice on all evening papers shall be uniform and on all morning papers shall be uniform.

Steady drivers, to the maximum extent possible, shall be assigned regular starting times with two steady days off.

All steady relay drivers shall be assigned specifically set and steady day to day relays and such relays shall not be subject to change in any way except for sufficient cause.

SECTION 11. All time in excess of 8 hours, day work, or 7 1/2 hours, night work, exclusive of lunch time, shall be paid for at time and one-half on the regular straight time rates.

Overtime rates shall be paid only for actual time worked in excess of the hours set forth in this section. Where an employee commences work before or after his regular starting time he shall not be entitled to pay at the overtime rate until after he has worked 8 hours, day work, and 7 1/2 hours, night work. Work performed within the day hours shall be paid for at the day rate. Work performed within the night hours shall be paid for at the night rate.

Time worked immediately prior to the beginning of an individual's scheduled starting time shall be paid at time and one-half, only when such work is scheduled and authorized by that individual's supervisor.

The Employer will make a sincere effort to assign sixth days of overtime to regular full time drivers according to a strict company seniority list. However, if using a driver on a sixth day would adversely affect the operation because of the driver's inexperience or inability to handle the equipment, or his not being familiar with a run or an area, he will not be used, i.e., a run requiring a tractor trailer will not be given to a driver who can only drive a route truck or a city route to a driver who does not know the area or the route.

For the purpose of calling for sixth days, the Employer will keep two separate seniority lists: 1) Mail and Relay; 2) Routes. Within the mail and relay list, tractor trailer drivers will be so indicated and will be called for both straight truck work or tractor trailer work. A driver will be called in seniority order for a sixth day as needed. The Employer will not be required to wait for return calls if that would jeopardize proper planning or distribution of the product.

In the assignment of overtime, the Employer will not discriminate based upon the employees' rate(s) of pay.

SECTION 12. Any man on being recalled after leaving the premises at the conclusion of a day's or night's work shall be paid for the time worked after he is thus recalled at the overtime rate of time and one-half, and shall be paid a bonus of Two Dollars ($2.00), whether employed or not. There shall be at least a ten hour interval between work shifts.

All drivers are required to have a 10 hour bridge between the time they finish a shift and start their next one. Whenever the bridge is broken the driver will receive overtime at time and one-half of his hourly rate. The overtime will be the amount of time the 10 hour bridge was broken by, up to a maximum of 10 hours.

SECTION 13. All garages of the Employer shall be provided with time clocks. Overtime shall be paid on the basis of overtime worked as reflected by such time records.

SECTION 14. Each driver and chauffeur shall be entitled to two days off without pay each week in the order of his seniority, the selection of the days off to be subject to the approval of the Employer. The two days off shall be consecutive, whenever feasible, at the convenience of the Employer.

SECTION 15. The Scale of Wages and Hours per day and week shall be as follows:

- In lieu of a first year wage increase, the Employer will make a one-time, non-precedential lump sum payment to each bargaining unit member active on the date of signing of this Agreement of $1,000, less deductions for taxes. These payments will be made by separate check in the first pay period in January 2013.

*From December 15, 2012 to
May 14, 2014 inclusive:

DAY WORK

| Per Day | Hours Per Week | Days | Rate |
|---|---|---|---|
| 8 | 40 | 5 | $1,120.50 |
| 8 | | 1 | $ 224.10 |

NIGHT WORK

| Per Day | Hours Per Week | Days | Rate |
|---|---|---|---|
| 7 1/2 | 37 1/2 | 5 | $1,125.10 |
| 7 1/2 | | 1 | $ 225.02 |

*The wage increase will be subject to the Employer's unilateral right to implement an overall wage freeze. The employer will notify the Union prior to any implementation of a wage freeze.

Employees hired on or after the effective date of this Agreement will be paid at 80% of the then current rate. This percentage will increase 5% each year on the employee's anniversary date until the employee reaches the full rate after four years.

Trailer (10-ton and over) Pay..........$4.00 per day in addition to day or night scale wages. Trailer pay shall be paid to all drivers of Tractor-Trailers, combination and/or tandem axle vehicles or any other type of trailer attachment or hook-on.

SECTION 16. It is the intention of the Employer that any records required by the Employer shall be done on Company time.

SECTION 17. Regular wages shall be paid on Sundays for work done on regular editions. For work done on other than regular editions when men are especially called to work on Sundays between the hours of 7 A.M. and 6 P.M., the rate of pay shall be as follows: For an hour or less work, time and one-half for each hour up to four (4) hours plus a bonus of $1.00; for

4

four (4) hours, one day's pay, for four (4) to eight (8) hours, the pay shall be for a day and a half.

Effective January 15, 1981, all drivers shall be in at 8:00 A.M. on Easter Sunday, Christmas Day and New Year's Day, and there shall be no recovery on these days. Drivers whose shifts extend beyond 8:00 A.M. on Easter Sunday shall be paid at time and one-half for all time worked after 8:00 A.M. and shall be paid at double time for all time worked on Christmas Day and New Year's Day after 8:00 A.M.

SECTION 18. The Employer may employ extra men by the day or night and pay them on the basis of the regular day or night rate, but not less than 8 hours day or 7 1/2 hours night.

SECTION 19. The Employer shall have a representative at each garage at the time collections are turned in by drivers. Such representatives shall give the driver a receipt for the money bags or envelopes after such money bags or envelopes have been deposited in a safe by the representative of the Employer. Drivers holding such receipts shall not be held responsible for a money bag or envelope that is subsequently lost. At the option of the Employer, its representative may give the drivers a receipt for actual collection.

The Employer shall provide a cashier at his main garage to receive and count all monies and checks from drivers at the place of turn-in for which a receipt shall be given the driver at the time of turn-in.

SECTION 20. It is the intent of the Employer that no driver shall suffer consistent and continuous losses on the bag and/or receptacle operation. Reports of continuous losses must contain full details about such losses and shall be made to a designated representative of the Employer. Such reported losses shall be investigated and a representative of the Union may participate in such investigation. The disposition of each reported case will depend upon the results of the investigation of that case.

The Employer will reimburse up to fifteen dollars ($15.00) of personal monies in case of robbery while driving on a scheduled shift, provided the driver has complied with and completed all reporting requirements of that Employer.

All route trucks shall be equipped with safes, into which drivers shall deposit all money collected.

SECTION 21. It is expressly understood and agreed, by and between the parties hereto, that the stuffing or inserting of newspapers, newspaper supplements, circulars, flyers, magazines, envelopes, community newspapers, or any other type of promotional or printed material is not the work of drivers and chauffeurs and no driver or chauffeur shall be directed or required to perform such work.

The parties have agreed that the only exceptions to the foregoing general rule shall be the following specific and limited instances:

(a)     Those drivers and chauffeurs who furnish newspapers to vending racks shall be permitted to perform not more than double-inserting and/or stuffing in vending racks only of the Sunday parts into the Sunday edition(s) provided that the existing practices with respect to helpers relative to parts shall not be diminished or reduced. When a third Sunday insert package is handled by a route driver, the Employer has the option of providing an extra helper, or paying the route driver one hour of overtime at time and one-half.

(b)     Drivers and chauffeurs employed by the Chicago Sun-Times and Chicago Tribune shall be permitted to perform the single stuffing or inserting of the existing Thursday parts package only in the event that no helpers are available after the Employer has made good faith efforts to obtain such helpers. It is expressly agreed between the parties hereto that the Union shall have the right at any time to negotiate with the Employer regarding problems of drivers arising out of this Section.

SECTION 22. It is further agreed that the Employer shall have the option of delivering all or part of the Sunday editions either by dividing the Saturday night and Sunday operation into two (2) shifts and employing a different employee on each shift, or by working one employee for the entire continuous shift, with pay at the rate of time and one-half for hours worked in excess of 8 hours on afternoon papers and 7 1/2 hours on morning papers. It is understood and agreed that in those cases where the Employer elects to operate on the two-shift basis, the Union offers to furnish sufficient men to cover each of the shifts at straight time rates.

SECTION 23. There shall be ten (10) recognized holidays: New Year's Day, Washington's Birthday (the third Monday of February), Memorial Day (the last Monday of May), Independence Day, Labor Day, Veteran's Day (the fourth Monday in October), Thanksgiving Day, Christmas Day, or days legally observed as such, the Employee's Birthday, and the Employee's steady payroll seniority date.

In the event that there is one date provided for under Illinois law with respect to a holiday called for in this Agreement and another date provided for by federal law, the date established by federal law shall be observed.

Whenever the Employee's Birthday and/or Steady Payroll Company Seniority Date falls on a regularly scheduled workday for the employee, the employee shall have the option to work these holidays and receive holiday pay at double his straight time rate as provided for in this section; or to take the day off and receive an additional day's pay for each holiday.

If an Employee's Birthday or Steady Payroll Company Seniority Date should fall on one of the other recognized holidays, the day will be treated like other holidays falling on the employee's normal day off or during a regularly scheduled vacation period, as set forth below and the employee shall be given an additional day's pay for each holiday.

Employees who are scheduled to work on any of the aforementioned holidays and are notified by the Employer that they will not be required to work on the said holidays shall be paid the straight time rates for such regularly scheduled shift. When a holiday falls on a normal day off or during the regularly scheduled vacation period of a regular employee and he is not required to work, he shall in each instance be given an additional day's pay, provided he works his scheduled shifts immediately before and after the holiday or the scheduled vacation period.

All time worked on a holiday, or days observed as such, shall be paid for at double the straight time rate, except that when the holiday falls on Saturday or Sunday, employees working on the Sunday paper beginning with shifts starting after noon on Saturday and continuing until the completion of the delivery operation on Sunday, shall be paid the straight time rate.

For the purposes of these provisions, holidays, i.e., days legally observed as such (herein covered by the designation "holidays"), shall at the option of the Employer cover either of the following periods:

(1) The normal period involved in the delivery of the newspaper bearing the date of the holiday if the newspaper is published, or if publication is suspended on the holiday, the holiday shall cover the period normally involved in the delivery of the newspaper on weekdays when it is published, or

(2) A 24-hour period beginning at 12:01 o'clock, midnight on the day of the holiday and ending at 12:00 o'clock midnight, the night of the holiday, and only those scheduled shifts the majority of straight time hours of which fall within the designated 24-hour period shall be recognized as holiday shifts for the purpose of these holiday provisions. If a majority of the straight time hours of a scheduled shift does not fall within the designated 24-hour period, the shift shall not be recognized as a holiday shift even though the shift may be scheduled to start or end during the 24-hour period.

6

Nothing herein shall interfere with the right of the Employer to change starting times during the holiday period to fit the holiday operation.

It is understood that there shall be no duplication of holiday payments under any circumstances. All work performed on shifts, including overtime, which qualify as holiday shifts, shall be paid for at double the straight time rate. Overtime, however, shall not be pyramided.

When working groups are reduced during holiday operation, seniority shall prevail in assignment of the remaining work involved.

## VACATIONS

SECTION 24. (a) The Employer will grant to employees during the calendar year, vacations with pay during the following calendar year on the following basis:

(b) Employees who have completed two or more years of continuous service with one Employer any time during the year 1972, or during any year thereafter, shall be entitled to earn vacation credits during the year 1972 or during any year thereafter, at the rate of 1/11th of a day's vacation for each day worked.

(c) All other employees shall be entitled to earn during the year 1972 and during any year thereafter, vacation credits at the rate of 1/16th of a day's vacation for each day worked.

(d) Vacation credits shall be allowed for all straight-time days worked, for recognized holidays worked which shall be counted as one day, for recognized holidays scheduled to be worked but not required to be worked; but shall not be allowed for scheduled vacation days not worked, for the extra days paid because of a recognized holiday falling on a scheduled off day or during a scheduled vacation or for days for which the overtime rate is paid for a full shift.

(e) In no event shall an employee earning vacation credits at the rate of 1/11th of a day for each day worked be entitled to more than 4 weeks' (20 days') vacation nor shall other employees be entitled to more than 3 weeks' (15 days') vacation.

(f) Vacations earned in one calendar year shall be taken during the next calendar year.

(g) Fractional credits of less than a full day shall be paid to regular employees at the time they take their vacations. Extras and those who have left their place of employment, voluntarily or otherwise, shall be entitled to and shall receive their vacation pay on a pro rata basis, including fractional credits, by March 1st of the next calendar year.

(h) Vacation credit must be earned within the calendar year. Fractional credits will not be carried forward into the following calendar year.

(i) Vacations may be scheduled by the Employer at the convenience of the Employer at any time during the calendar year, but shall insofar as is feasible without impairment of normal operations of the Employer, be scheduled between January 1, and December 31 Vacations must be scheduled in 1-week increments. Vacations shall be scheduled with due consideration to priority. The vacation schedule shall be posted not later than December 15 of the previous calendar year. Vacation schedules, once posted, may not be altered.

(j) The positions of all employees while on vacation shall be covered.

(k) Up to ten (10) vacation drivers may pick their own runs each vacation period based on their relative seniority.

(l) Employees who have completed 20 years or more of continuous service with the Employer on December 31 of each year will be paid Five Hundred Dollars ($500.00) at the time he starts his vacation during the following calendar year, in addition to his vacation pay.

(m) Vacation credits shall accrue for scheduled work time lost for on-the-job compensable injuries under the care of an Employer-authorized physician.

(n) The practice of allowing vacation pay advances is hereby discontinued.

SECTION 25. The Employer shall make the following contributions to the Chicago Newspaper Publishers'-Drivers' Union Pension Plan:

Effective January 1, 2013, Seventy-Seven Dollars and Seventy-Three Cents ($77.73) per "straight-time" shift.

Effective January 1, 2014, Ninety Dollars and Seventeen Cents ($90.17) per "straight-time" shift.

The above contributions shall be made as required by Section 3 of the Chicago Newspaper Publishers'-Drivers' Union Pension Plan. Any Employer making contributions to the Plan pursuant to the provisions of this Section shall have the continuing right to make such changes or include such provisions by amendment or otherwise as may be necessary to reduce, modify, discontinue, or eliminate the participation of any driver in any pension, profit sharing, or other deferred compensation plan now in effect or hereafter established, except Federal Social Security.

SECTION 26. Effective September 1, 2011, drivers will become eligible to participate in, and the Employer shall contribute to, Teamsters Local Union No. 727 Health & Welfare Fund.

Drivers shall become eligible for medical, dental and vision benefits, and all other Company benefits on the first day of the month after they become employed as a regular driver and are put on the steady payroll. Medical, dental and vision benefits for covered drivers shall be discontinued on the first day of the month following termination as a driver for the Employer for reasons of resignation, death, discharge, layoff, physical inability to perform the work, or disability.

Contributions for covered drivers shall be made by the Employer at a maximum of the weekly amounts negotiated in each year contained in this Agreement as follows:

Effective September 1, 2011, the Employer shall contribute to the Teamsters Local Union No. 727 Health and Welfare Fund, on account of each employee covered by this Agreement, the following:

(a) For each full-time employee:

Commencing March 1, 2012, $796.00 per month.

Such rate shall continue except as adjusted by the Board of Trustees pursuant to the following provisions:

(b) Effective March 1, 2013 and March 1, 2014, an increase to the contribution rate provided for in this Section, per employee, per month, shall be set by the Trustees of the Fund and recognized by the Employer.

8

(c)    EMPLOYER AUTHORIZATION.  By the execution of this Agreement, each Employer (a) adopts and agrees to be bound by the Funds' Trust Agreements, and as they may be amended hereafter, as fully as if the Employer was an original party thereto, (b) designates the Trustees named in the respective Trust Agreements, together with their successors, as its representatives on the Board of Trustees of each Fund, and (c) agrees to be bound by all actions taken by each Board of Trustees pursuant to the powers granted them by federal law or the respective Trust Agreements, hereby waiving all notice thereof and ratifying all actions already taken or to be taken by the Trustees within the scope of their authority.  Each Employer also recognizes that each Board of Trustees has the sole power to construe the provisions of the respective Trust Agreements, the respective employee benefit plans, and each Funds' rules and regulations, if any.

(d)    DELINQUENT PAYMENTS.  It is agreed that in the event any Employer is delinquent in the payment of its contribution to the Health and Welfare Fund, in accordance with the rules and regulations of the Trustees of such Fund, the Trustees may require the payment as liquidated damages of an amount not to exceed twenty percent (20%) of the delinquent payment or fifty dollars ($50.00) whichever is greater.  It is agreed that in the event of any such delinquency, the Employer shall be responsible to the employee for losses resulting therefrom.  In the event the Trustees of the Fund are required to retain legal counsel and/or accountants to collect delinquent payments to the Fund, the Employer shall be responsible for the payment of the legal fees, accountant fees and court costs if it is determined that the Employer was delinquent.

(e)    ADDITIONAL PROVISIONS.  The following provisions shall also apply to the Teamsters Local Union No. 727 Health and Welfare Fund:

(1)    In respect to violations of this Article, if the Employer fails to maintain records which verify, substantiate or support the number of hours the person(s) performed, the Fund will make presumptions regarding the number of hours worked and the Employer may be bound by these presumptions.

(2)    In respect to violations of this Article, if the Employer fails to maintain records which verify, substantiate or support the number, type and date of services performed by such person or entity, the Fund will make presumptions regarding the services performed and the Employer may be bound by these presumptions.

(3)    In respect to this Article, the Employer when remitting contributions to the Fund is required to also submit on the Fund's remittance reports full, complete and accurate representations and accurate sums due for each month for each person.  Further, the Fund requires that contributions (with remittance reports if timely delivered to the Employer) are due by the 10th day of the month after the month in which the work is performed.  As of the due date, the contributions are considered the assets of the Fund.

benefits.    Employees will continue to contribute $15 per week for medical/dental/vision

Provided that Tribune Company continues to offer a medical flexible spending account program, employees covered under this Agreement will be eligible to participate in

Tribune's medical flexible spending account program.

The Employer shall continue contributions for any covered driver off work due to a personal disability and for any covered driver off work due to a job-related disability until such time as they return to work as a driver, or terminate employment as a driver.

1. <u>Definition of Extra Driver.</u> An extra driver is a driver who makes himself available for work during the entire week on any shift the Employer wishes to have him or her perform services under this Contract. An extra driver is not eligible for medical, dental and optical benefits and all other Company benefit programs. However, such employees shall be eligible for all other rights under the collective bargaining agreement.

2. <u>Eligibility of Extra Drivers.</u> After an extra driver completes three (3) months of continuous employment with the Employer, he or she shall be placed on the steady payroll of the Employer as a regular driver. Each May and November, the Employer and the Union will meet to review the status of any extra driver who has not been made a regular driver due to a break in service by reason of disability (illness or injury). Continuous employment shall not be broken provided the employee has not missed more than fifteen (15) calendar days in such six-month period by reason of disability (illness or injury). Company seniority shall start on the day the employee becomes a regular driver.

If the employee is not placed on the steady payroll, he shall be interviewed by a representative of management and promptly notified of the Employer's decision and the reasons therefor. If the Union believes the reasons given are not just, the matter shall be subject to the grievance procedure.

3. <u>Auxiliary Driver.</u> The Employer may employ up to five (5) auxiliary drivers. An auxiliary driver is defined as an employee who only works one day per week, either Saturday or Sunday issue. Such employees shall be considered a member of the bargaining unit and shall be subject to the provisions of Section 1 of the Contract, but shall not be entitled to medical, dental and optical benefits and all other Company benefit programs. Auxiliary drivers will not be assigned to work in a given work week unless all regular drivers have been scheduled to work (or have had the opportunity to work) five (5) shifts in that work week.

4. <u>Coverage Under Negotiated Medical Plans For Employees Not Working For Reason Of Personal Disability Or Personal Injury.</u> If a regular driver, otherwise entitled to medical benefits under this Contract is unable to work due to personal illness or personal injury, his or her coverage under the medical, dental and optical benefits provided under this Contract shall continue and contributions shall be made by the Employer for up to six (6) months after an employee has used all of his or her short-term disability benefits or until such time that employee's employment as a regular driver in this bargaining unit is terminated. Upon termination of coverage, the employee would be eligible, based upon the requirement of law, to continue his or her coverage subject to premium payments required under COBRA.

With respect to questions concerning termination of employment as a regular driver for those persons unable to return to work due to personal illness or personal injury, the Employer's Medical Director will determine when a person should be returned to work and if the employee is able to return to work. Should the employee's treating physician dispute, with a letter stating the reasons why such employee may not return to work, the Employer's Medical Director, the Employer and the Union agree that an independent, competent evaluator will be mutually agreed upon and selected. Such independent evaluator shall be competent in the necessary specialties and licensed to practice medicine in the State of Illinois. The decision of this third party will determine whether or not the Employer's action resulting in the termination of medical, dental and optical benefits was appropriate. In the event the decision of the third party is inconclusive, the parties agree to refer the matter to a fourth independent, competent evaluator under the same terms and conditions as hereinbefore stated for the third party. In no case, shall an employee have his benefits continue under medical, dental and optical plans provided by this Agreement following the eighteenth month after the employee ceased working due to personal illness or personal injury. In the event the neutral party shall determine that the employee could not return to work, and if the Company has cut off any benefits to which the employee would have been entitled, such benefits shall be restored retroactively. The decision of the neutral party shall be final and binding.

10

This continuation of coverage for employees on personal illness or personal injury begins on the first day an employee is out following such illness or injury and will cease six (6) months after the expiration of the employee's Company sick leave. This means an eligible employee will continue to have coverage up to six (6) months after his/her Company disability benefits end, unless the employee returns to work or terminates their employment sooner.

5. <u>Personal Leave.</u> Personal leave not to exceed one (1) week can be granted to regular drivers at the discretion of the Employer. Such personal leave will be without pay. However, medical, dental and optical coverage as provided under the terms of this Agreement shall continue at no cost to the employee during this period of personal leave. Should the Employer be required by law to extend leave beyond the one (1) week provided herein, the employee can continue his medical, dental and optical coverage by paying for such coverage as required in the premium agreement the Employer has with the insurance provider(s). The employee who wishes to continue coverage in this manner shall prepay an amount equal to the weekly premium to the Employer for each week the employee wants such coverage to continue.

6. <u>Worker's Compensation.</u> Employees not working due to industrial injuries shall continue their coverage and the Employer will continue to make contributions for a period of up to eighteen (18) months following such accident or injury. During this eighteen (18) month period, coverage will be provided. This provision will in no way limit the medical coverage the employee will receive as a result of injuries or accidents as provided under Illinois Workmen's Compensation statutes. Coverages will continue until such time as the employee is no longer employed as a regular driver.

If an employee takes alternative employment in another department of the Company due to an inability to perform work as a regular driver, such employee's benefits will be governed by the Contract or practice for similarly situated employees in these other departments. Should an employee reach maximum medical improvement and not return to work as a regular driver and not remain in the employ of the Employer, his medical, dental and optical benefits shall be terminated immediately.

Terminations in these matters will be made in accordance with usual Worker's Compensation administrative procedures. Should a dispute arise under this paragraph, it shall be resolved in the usual manner as practiced before the Illinois Industrial Commission.

7. <u>Conflict.</u> If any term or provision of this Agreement is, at any time during the life of this Agreement, found to be in conflict with any law, such term or provision shall become invalid, but such invalidity or unenforceability shall not impair or affect any other term or provision of this Agreement. The parties further agree, notwithstanding any other provision of this Agreement, to meet within thirty (30) days of the enactment of any law invalidating such term or provision, for the sole purpose of negotiating a replacement for such invalid term or provision. Any conflict between payments required under the provisions of this Agreement and applicable law shall be resolved in favor of existing law.

SECTION 27. The Employer shall pay benefits to drivers covered by this contract on the basis hereinafter set forth, in the event of absence caused by an on-the-job injury arising out of or sustained during the course of employment by the Employer.

$50.00 per week for a maximum of 13 weeks for any one such injury. Benefits for occupational back injuries arising out of or sustained during the course of employment will be paid only when diagnosed by objective findings of a qualified physician. If an employee is off eight (8) or more days due to a compensable injury, benefits shall commence with the first day of absence. These benefits are in addition to Workmen's Compensation and shall be payable only in the event Workmen's Compensation is allowed and paid for such injury.

SECTION 28. In the event of the death of a mother, father, daughter, son, brother, sister, father-in-law, mother-in-law or spouse of a regular full time employee covered by this contract, the employee will be granted funeral leave with pay, but in no case shall the leave extend beyond the day of the funeral, and shall not exceed a total of three scheduled working days, except that such employees who are members of an ethnic group that requires the funeral to be held on the day following death shall be granted funeral leave with pay for the day of death

11

and for the two days following, provided they are scheduled working days. Effective January 1, 1996 a regular full time employee will be granted funeral leave with pay, in the event of the death of a step-child, under the same provisions currently applicable in the event of the death of a natural child.

SECTION 29.  Any regular employee who is absent from his employment to serve on a jury shall be paid his regular scheduled straight-time wages minus any pay received as such juryman for such time as he is required to be absent, up to a maximum of 30 scheduled working days. The Office shall be notified promptly of such call to jury service, and such jury service shall be certified by the Clerk of the Court.  The position of any employee on jury duty need not be filled except at the option of the Office.

SECTION 30.   In the event of merger, consolidation or suspension of the newspaper covered by this Agreement, the Employer agrees to bargain with the Union over the effects of such merger, consolidation or suspension in accordance with applicable labor laws, and all regular employees having one year or more of regular employment with such newspaper who thereby are deprived of such regular employment shall receive suspension or merger pay no less than as follows:

Employment of 1 year.............   1 week
Employment of 2 years............   2 weeks
Employment of 3 years............   3 weeks
Employment of 4 years or more....4 weeks

SECTION 31.  It is agreed that both the language and spirit of this Agreement guarantees the prompt and faithful performance by the Union of all service demanded by the Employer at the time required and without waiting for the consideration or adjustment of an differences of opinion respecting the rights of either party.  It is recognized that it is imperatively obligatory upon both parties whenever any difference of opinion as to rights of either under the Agreement shall arise, or whenever any dispute as to the construction of the Agreement, or any of its provisions takes place, at once to appeal to the duly constituted authorities under this Agreement, as set forth in Section 32 of this Agreement.  It is agreed that during the life of this Agreement there shall be no strikes, sympathetic strikes or lockouts, or interruption of the work of any kind in the prosecution of the business in which the parties have a community of interest. It is understood that a cessation of publication for causes beyond the Employer's control shall not constitute a lockout.

SECTION 32.  In order to provide an orderly method for handling and disposing of all disputes, misunderstandings, differences or grievances arising between the Employer and the Union or the employees covered by this Agreement as to the meaning, interpretation and application of the provisions of this Agreement, such differences shall be settled in the following manner.

In the event the Union questions a member's complaint of hardship regarding excessive route stops or an excessive number of bundles on a relay, a complete investigation will be made by all parties involved to determine whether the claim is warranted.  If the working conditions prove to be a hardship an adjustment will be made.

Employees, either alone or with a Steward, should first attempt to resolve any differences or disputes concerning the meaning or application of a specific provision of this Agreement with the supervisor or Transportation Department management.

The grievance and arbitration procedure shall be as follows:

12

**Step One:** The Union must first present the grievance in writing to an appropriate Employer representative within ten (10) calendar days after the Union has, or reasonably should have, knowledge of the facts giving rise to the grievance. The written grievance shall contain the name and job title of the aggrieved employee(s); the date of the incident complained of; the specific contract provision alleged to have been violated; and the relief sought. The Employer representative shall meet with the Union at a mutually convenient time, and the Employer shall give a written answer to the grievance within twenty (20) calendar days following the completion of the Step One meeting(s).

**Step Two:** If the grievance is not resolved at the First Step, the Union, but not an individual employee or employees, may submit the grievance to arbitration by serving a written request to arbitrate upon the Employer within thirty (30) days of receipt of the Step Two answer. The parties will then select an arbitrator. If the parties cannot agree on an arbitrator, one shall be selected in accordance with the rules of the Federal Mediation and Conciliation service then in effect.

The time limits set forth above may be extended by mutual consent in writing. Unless an extension is agreed to, if the Employer does not answer a grievance within the above time limits, the Union may refer the grievance to the next step in the procedure, and if a grievance is not appealed within the above time limits, the grievance shall be considered settled.

The arbitrator's authority shall be limited to interpreting the provisions of this Agreement, and the arbitrator shall have no power to amend, modify, change, add to or delete from the terms of this Agreement. The decision of the arbitrator shall be final and binding on all parties to the dispute, including the employee(s) involved.

Each party shall bear its own expenses incurred in the presentation of its case. All fees and expenses of the arbitrator, the cost of the hearing facility, and the costs of a transcript of the arbitration hearing shall be borne equally by the Employer and the Union.

SECTION 33. It is understood that all questions primarily concern the two contracting parties alone and are not to be taken up for or against any individual member of either one of them.

SECTION 34. The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his or her regular paycheck on a biweekly basis. The Employer shall transmit to DRIVE National Headquarters on a monthly basis, in one check, the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's social security number and the amount deducted from the employee's paycheck.

SECTION 35. The Employer shall endeavor to provide equipment that is mechanically sound and properly equipped.

SECTION 36. The Employer agrees to grant the necessary time off or leave of absence without discrimination or loss of seniority rights to any employee serving on official union business. Reasonable notice shall be given the Employer of such requirements.

SECTION 37. In the event the Employer acquires and places into operation for their own exclusive use semi-trailers having a rated capacity of ten (10) tons or more, for the purpose of delivering their printed newspapers or printed sections to newsstands or dealers, it is understood and agreed that a wage scale for the drivers of said semi-trailers will be negotiated

13

with the Union within ten (10) days thereafter.

Parties currently covered by this Agreement have negotiated a rate of Four Dollars ($4.00) per day in addition to regular day or night scale wages.

SECTION 38. Whether created by prior contract or past practice, any and all restrictions on the Employer's right to distribute or deliver from one truck publications or printed materials of any kind, both within the City of Chicago and outside of the City of Chicago, are hereby abolished and made null and void. The Employer has the unfettered and unrestricted right to deliver from any truck any and all publications or printed materials, both within the City of Chicago and outside of the City of Chicago, including but not limited to, publications or printed materials printed or produced at Freedom Center (or any other production or distribution facility owned, operated or utilized by the Employer) and, without limitation, publications or printed materials which the Employer may contract to distribute or deliver, provided, however, that other than currently existing delivery arrangements that do not use bargaining unit drivers (e.g., home delivery contractors and carriers, single copy contractors and carriers outside of the city of Chicago, independent haulers from suburban distribution centers), any and all such distribution and/or delivery shall be by drivers who are bargaining unit members.

SECTION 39. Drivers and chauffeurs shall not be compelled to do garage work within the garage.

SECTION 40. Under no circumstances shall members of the Union be allowed or ordered to do outside posting or to hang posters in windows of dealers.

SECTION 41. The Union shall not be bound by any provisions of the articles of association, by-laws, charter, constitution, codes, laws, regulations, resolutions or rules of any character of the Employer which are in conflict with the provisions of this Agreement. The Employer shall not be bound by the constitution, by-laws, resolutions, rules or regulations of the Union which are in conflict with the provisions of this Agreement. Each party, however, recognizes the right of the other to adopt laws and regulations of any character for the government of its own members.

SECTION 42. This Agreement shall continue in full force and effect to and including June 14, 2014..

In the event that a wage freeze is imposed by the Government during the life of this Agreement that would reduce wages and/or fringe benefit contributions as provided for under the terms of this Agreement, the parties shall thereupon have the right to reopen the Agreement and negotiate with respect to these matters and other working conditions.

Written notice of a desire to amend this Agreement must be delivered by the one party to the other not less than sixty (60) days before the 15th day of December, 2012, or the 15th day of June in any succeeding year, and under such notice, so delivered sixty (60) days in advance, amendments to this Agreement can be made effective only as of the date of June 15, 2014, or on a day thereafter when such changes are mutually agreed upon,. Provided that such amendments, when determined upon, shall continue for a further term of at least two years. When amendments as so proposed by either party, alternative amendments may then be proposed in writing by the other party within thirty (30) days.

The Contract covers all principal matters between the parties and is executed in four originals. In witness whereof the parties hereto have caused these presents to be executed by their duly authorized representatives, and the seal of the Union to be hereto affixed this ____ day of December, 2012.

14

ACCEPTED AND AGREED:    ACCEPTED AND AGREED:


_____  _____
for Chicago Tribune Company, LLC  for Teamsters Local 727


_____  _____
Date          Date

## Side Letter #1

Employees hired March 1, 2005 and after, will earn vacation during the calendar year that it is taken. All employees will continue to select vacation based on seniority. Vacation pay for employees hired March 1, 2005 and after, will be based on what has been earned and unused in the current year.

_____

_____

_____

Representing

NEWSPAPER, MAGAZINE, PERIODICAL
SALESMEN, DRIVERS, PRESSMEN,
DIVISION MEN, DISTRICT MANAGERS, CHECKERS,
VENDORS, HANDLERS UNION AND ELECTRONIC MEDIA WORKERS
LOCAL NO. 706
Affiliated With
I.B. of T.,C.,W. and H. of A.

_____

_____

_____

Representing

CHICAGO TRIBUNE COMPANY

## Side Letter #2

Drivers will be converted to a bi-weekly payroll. Moreover, drivers participating in direct deposit will receive their pay stubs electronically.

_____    _____

_____    _____

_____    _____

Representing

NEWSPAPER, MAGAZINE, PERIODICAL
SALESMEN, DRIVERS, PRESSMEN,
DIVISION MEN, DISTRICT MANAGERS, CHECKERS,
VENDORS, HANDLERS UNION AND ELECTRONIC MEDIA WORKERS
LOCAL NO. 706
Affiliated With
I.B. of T.,C.,W. and H. of A.

_____    _____

_____    _____

_____    _____

Representing

CHICAGO TRIBUNE COMPANY

17

## <u>Side Letter #3</u>

The dues deduction authorization form as provided-for in Section 1 of the collective bargaining agreement shall be as follows:

Dues Deduction Authorization
<u>Chicago Tribune Company/ Teamsters Local No. 727</u>

I hereby authorize Chicago Tribune Company to deduct from my first paycheck of each month an amount equal to the regular monthly dues, as certified by Teamsters Local No. 727. The monthly dues are currently $_____. The Company will turn over to Local No. 727 on a monthly basis the monthly dues deducted on behalf of each authorizing employee. This authorization is voluntary on my part and can be revoked at any time as long as it is done so in writing.

Signature_____ Date_____

Name (Printed)_____

Address: _____
_____

Soc. Security Number: _____
Union dues no._____ I.D. Number_____

_____

# Side Letter #4

## A G R E E M E N T

It is expressly understood and agreed by both parties, the Chicago Tribune and Newspaper Drivers Union, Local 706, I.B. of T. that this letter concerning drivers' seniority will become part of the Contract Agreement effective December 15, 2007 to December 15, 2010 and will remain in full force contract to contract year after year thereafter unless modified through the collective bargaining process.

## ROUTE AND RELAY DRIVERS

In the event routes or relays are diminished or eliminated (3 or more days), strict preference shall be given to employees in accordance with Company seniority. The following steps and procedures will take place.

Step 1. The driver or drivers involved will have the right at their option to chain bump in accordance with Company seniority within the Company, routes or relays, to a maximum of 5 bumps.

Step 2. Drivers involved, who lose their work as a result of Step 1, will have the option to bump anyone on the Company vacation list in accordance with Company Seniority.

Step 3. Any driver or drivers who remain after Step 1 and Step 2 and **do not have steady work** will be placed in a pool with the bottom 5 steady drivers in Company seniority on the steady payroll, route or relay, and a chain bumping procedure will take place until the scenario is completed. In the event there is no work available for the bottom steady driver bumped, the lowest driver will become a vacation driver ending the bumping.


FOR THE CHICAGO TRIBUNE                    FOR LOCAL UNION NO. 706


_____                    _____


_____                    _____


DATE: _____                      DATE: _____

19

## SIDE LETTER #5

Due to the underfunded status of the Chicago Newspaper Publishers-Drivers Union Pension Fund and the desire of both the Employer and the Union to adopt the Preferred Rehabilitation Plan and thereby maintain all of the existing benefits under the pension plan, the parties agree that, for the term of this Agreement, the provisions of Section 26 regarding employee contributions for health and welfare coverage are suspended and $15.00 per week will deducted from employees' earnings to help defray the Employer's cost of providing STD benefits.

ACCEPTED AND AGREED:                    ACCEPTED AND AGREED:

_____                 _____
for Chicago Tribune Company             for Teamster Local Union No. 727


_____                 _____
Date                                    Date